**REVISED May 21, 1997**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 95-60541

---

ESTATE OF ALTO B. CERVIN, Deceased,
Bennett W. Cervin, Executor,
& Nita-Carol Cervin Miskovitch, Executor,

Petitioner-Appellant,

VERSUS

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

---

Appeal from the United States Tax Court

---

May 9, 1997

Before POLITZ, Chief Judge, and SMITH and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

The Estate of Alto B. Cervin petitioned the United States Tax Court for a redetermination of a federal estate tax deficiency asserted against it by the Internal Revenue Service. The alleged deficiency was based upon a determination by the Commissioner that (1) the decedent's gross estate should include one hundred percent of the proceeds of three whole life insurance policies, and (2)

the estate was not entitled to a twenty-five percent discount with respect to the valuation of certain real property. The Tax Court held that (1) the gross estate includes one hundred percent of the proceeds of the life insurance policies, and (2) the estate was entitled to a twenty percent discount with respect to the valuation of the real property. The estate unsuccessfully moved for litigation costs. It now appeals, asserting that only fifty percent of the proceeds of the life insurance policies should be included in the gross estate and that it is entitled to litigation costs pursuant to section 7430 of the Internal Revenue Code.

We hold that the decedent's gross estate includes only fifty percent of the proceeds of the three life insurance policies, and that the estate is entitled to reasonable litigation costs. Thus we reverse the Tax Court's decision and remand to the Tax Court for a determination of such costs.

BACKGROUND

Alto B. Cervin ("decedent") and Manita Cervin were husband and wife, and both were domiciled in Texas. The couple had two children, Bennett W. Cervin and Nita-Carol Cervin Miskovitch, who are the co-executors of the Estate of Alto B. Cervin.

Alto and Manita Cervin purchased three whole life insurance policies from Mutual Life Insurance Company of New York on the life of Alto Cervin. Manita Cervin and the couple's two children were the beneficiaries. The policies were purchased with community funds, and the premiums were paid, while the decedent and Manita Cervin were alive, with community funds.

2

Manita Cervin died intestate in 1978, and one-half of the cash surrender value of the insurance policies was included in her estate. Her one-half interest in the policies passed under Texas intestacy law to the couple's two children. The children, however, after consultation with their father, did not exercise their right to receive one-half of the cash surrender value of the policies, and the insurance policies remained in effect. For reasons of convenience, the three agreed that Alto Cervin would continue to pay the premiums and deal with any other administrative matters regarding the policies.

Alto Cervin died in 1988, and his estate included one-half of the proceeds of the life insurance policies ($65,462.88). The estate also included accounts receivable in the amount of $35,268.16 from the children, as reimbursement for the insurance premiums paid by decedent on their behalf from the time of his wife's death to his own death.

At the time of his death, Alto Cervin owned a fifty percent undivided community interest in four parcels of real estate, and his children owned equal shares of the other fifty percent interest. The overall fair market value of each of the properties is undisputed,[1] but instead of valuing its share of the properties at fifty percent of the total fair market value, the estate

---

[1]The four pieces of real property, with their undisputed overall fair market valuation, are as follows:
(1) 657-acre farm in Ellis and Johnson Counties, TX: $650,000;
(2) homestead at 4343 W. Lawther Dr., Dallas, TX: $625,000;
(3) 6318 Vickery Blvd., Dallas, TX: $27,000; and
(4) 1633 E. Main St., Grand Prairie, TX: $60,000.

discounted the value of its ownership interest by twenty-five percent. It reasoned that an undivided fractional interest in real property may be valued at an amount less than the fractional share of the value of the entire property because of the difficulty in selling only a proportionate interest in an undivided piece of real estate. The estate's valuation of its ownership in the properties, less the twenty-five percent discount, thus totaled $510,750 (681,000 - 170,250), the figure that was included on Alto Cervin's estate tax return, filed on March 5, 1990.

Upon audit, the Commissioner determined that all of the proceeds of the insurance policies ($130,925.76) were includible in Alto Cervin's gross estate, and that the estate was not entitled to exclude the receivables from Bennett and Nita-Carol. In addition, the Commissioner determined that the estate was not entitled to the twenty-five percent discount on any of the properties.[2] The estate petitioned the Tax Court for a redetermination.

The Tax Court held that (1) the decedent's gross estate includes one hundred percent of the insurance proceeds, but that the estate could exclude the receivables owed by Bennett and Nita-Carol, and (2) the estate was entitled to a twenty percent discount in valuing the two pieces of property at issue. The estate then sought an award of litigation costs pursuant to section 7430 of the Internal Revenue Code, and moved for reconsideration of the insurance proceeds issue in light of our decision in Estate of

---

[2]At trial, the Commissioner accepted the estate's valuation of the two lesser-valued properties.

4

Cavenaugh v. Commissioner, 51 F.3d 597 (5th Cir. 1995). The Tax Court denied both motions. The Cervin estate now appeals, arguing that only one-half of the insurance proceeds is includible in the gross estate and that it is entitled to reasonable litigation costs.

## STANDARDS OF REVIEW

We review the Tax Court's findings of fact for clear error and its legal conclusions *de novo*. Park v. Commissioner, 25 F.3d 1289, 1291 (5th Cir.), cert. denied, 115 S. Ct. 673 (1994); Harris v. Commissioner, 16 F.3d 75, 81 (5th Cir. 1994). The Tax Court's holding that all of the proceeds of the life insurance policies are includible in the decedent's gross estate is based upon an interpretation of Texas law, and is subject to *de novo* review. We review the denial of a request for litigation costs for abuse of discretion. Nalle v. Commissioner, 55 F.3d 189, 191 (5th Cir. 1995).

## DISCUSSION

### I. THE LIFE INSURANCE PROCEEDS

The Internal Revenue Code (the "Code") imposes a tax on a decedent's taxable estate, 26 U.S.C. § 2001, which is defined as the gross estate less allowable deductions. 26 U.S.C. § 2051. If, as here, a policy on a decedent's life names beneficiaries other than the decedent's estate, section 2042(2) of the Code mandates that the decedent's gross estate include the proceeds of life insurance policies with respect to which the decedent possessed "incidents of ownership" at his death. 26 U.S.C. § 2042(2). Thus,

5

we must determine to what extent Alto Cervin possessed incidents of ownership in the three life insurance policies at his death. To resolve this question, state law must be considered. <u>See</u> Treas. Reg. § 20.2042-1(c)(5); <u>Broday v. United States</u>, 455 F.2d 1097, 1099 (5th Cir. 1972).

As an initial matter, it is necessary to define some terms at issue in this case. The Treasury Regulations define "incidents of ownership" as:

> the right of the insured or his estate to the economic benefits of the policy. Thus, it includes the power to change the beneficiary, to surrender or cancel the policy, to assign the policy, to revoke an assignment, to pledge the policy for a loan, or to obtain from the insurer a loan against the surrender value of the policy, etc.

Treas. Reg. § 20.2042-1(c)(2). This definition is nearly identical to what this Court has referred to as "policy rights" under Texas law. <u>See</u> <u>Commissioner v. Chase Manhattan Bank</u>, 259 F.2d 231, 245-46 (5th Cir. 1958). Policy rights refer to the "whole bundle of incidents of ownership of property in a policy." <u>Id.</u> at 245. Policy rights or incidents of ownership, however, must be distinguished from the "proceeds rights," which are rights to receive the proceeds of the insurance policy at maturity. In fact, policy rights include the entire bundle of ownership "except the right to the proceeds." <u>Id.</u>

Although policy rights and proceeds rights are distinct under Texas law, if "life insurance is purchased during a marriage and paid for with community funds, the 'policy rights' or incidents of ownership and the 'proceeds rights' or the rights to receive the proceeds in the future constitute community property." <u>Estate of</u>

6

<u>Cavenaugh v. Commissioner of Internal Revenue</u>, 51 F.3d 597, 602 (5th Cir. 1995) (quoting <u>Freedman v. United States</u>, 382 F.2d 742, 745 (5th Cir. 1967) (citing <u>Brown v. Lee</u>, 371 S.W.2d 694 (Tex. 1963))).  The parties do not dispute that the life insurance policies at issue were purchased during the Cervin marriage with community funds, and thus they agree that Manita Cervin owned an undivided one-half interest in both the policy rights and the proceeds rights at her death.

Further, at the time of Manita Cervin's death, Texas law provided that upon dissolution of the marriage by death, the surviving spouse is entitled to one-half of the community property, and the children are entitled to the other half of the community property.  Tex. Prob. Code § 45 (West 1980).[3]  Therefore, upon Manita Cervin's death, one-half of the incidents of ownership in the policies and one-half of the right to the future proceeds passed to Alto Cervin, and the other one-half of the policy rights and one-half of the proceeds rights descended to the children.

The parties are in full agreement as to the above analysis. It is at the next step in the analysis, however, that the disagreement begins.  The Cervin estate argues that because one-half of the incidents of ownership in the policies passed to the children, upon Alto Cervin's death he also possessed only one-half of the incidents of ownership in the insurance policies.  Because

---

[3]In 1991, the Texas Legislature amended Tex. Prob. Code § 45, and that section now requires that all community property of a spouse who dies intestate pass to the surviving spouse when all surviving children are also children of the surviving spouse.  Tex. Prob. Code § 45 (West Supp. 1997).

incidents of ownership determine the percentage of proceeds to be included in the gross estate, see 26 U.S.C. § 2042(2), and because Alto Cervin possessed one-half of the incidents of ownership, the estate asserts that only one-half of the proceeds should be included in the gross estate.

The Commissioner contends that the Cervin estate's analysis is incomplete because it does not consider whether Manita Cervin's community property interest in the insurance policies was settled prior to Alto Cervin's death. Based upon the Texas Supreme Court case of Brown v. Lee, 371 S.W.2d 694 (Tex. 1963), the Commissioner argues that Manita Cervin's interest in the policies was settled when one-half of the cash surrender value of the policies was allocated to her estate and reported on her federal estate tax return. Because Manita Cervin's interest was settled prior to Alto Cervin's death, the Commissioner maintains that Alto Cervin died possessing one hundred percent of the incidents of ownership in the insurance policies, and that section 2042(2) of the Code thus requires the inclusion of all of the proceeds in his gross estate.

Although we agree with the Commissioner that settlement of a predeceased, uninsured spouse's community interest in a life insurance policy on the life of the other spouse may extinguish the uninsured spouse's remaining interest in the policies, we believe that Manita Cervin's interest in the policies was never settled. Thus we hold in favor of the estate.

The Commissioner's argument that Manita Cervin's interest in the policies was settled prior to Alto Cervin's death is based upon

8

the following passage from <u>Brown v. Lee</u>:

> Under circumstances where the uninsured spouse predeceases the insured spouse, settlement of the decedent's community interest in the unmatured chose [i.e., the proceeds rights] has ordinarily been resolved by allocating one-half of the cash surrender value to the deceased's estate and the other one-half, plus ownership of the unmatured chose, to the surviving spouse. <u>Thompson v. Calvert</u>, 301 S.W.2d 496 (Tex. Civ. App. 1957, no writ). But in the present case, where settlement of the deceased wife's community interest in the policies was not made prior to the death of the insured and her heirs were not guilty of laches in failing to seek such compensation, the wife's community interest was never extinguished and the policies retained their community status up to the time of maturity. Consequently the proceeds are community.

371 S.W.2d at 696. Simply put, the above passage sets forth two rules for determining the proceeds rights (the rights to the "unmatured chose") of an uninsured spouse who predeceases the insured spouse. The first rule holds that when the uninsured spouse's community interest in the policies is settled, the uninsured spouse does not retain any right to the proceeds. The second rule holds that when such interest is not settled, the uninsured spouse maintains a community interest in the proceeds.

Based on no legal authority except the foregoing passage, the Commissioner asserts that Manita Cervin's interest in the life insurance policies was settled when one-half of the cash surrender value of the policies was allocated to her estate and included on her federal estate tax return. Thus, the Commissioner concludes that the first rule of the quoted passage mandates that full ownership of the proceeds rights be allocated to Alto Cervin (the then-surviving spouse), and that all of the proceeds must therefore be included in his gross estate pursuant to section 2042(2).

9

The Commissioner's theory is based upon the conclusion that reporting one's ownership interest in a life insurance policy on a *federal* estate tax return can settle one's interest in such policy under *state* community property law. Neither the Commissioner nor the Tax Court provides any authority for this novel proposition. We fail to see how Manita Cervin's estate, by adhering to federal estate tax law and including her one-half interest in the cash surrender value of the policies in her gross estate, has somehow settled her interest in the policies under the laws of the State of Texas.

The Commissioner's position is not only completely without support, it is also inconsistent with Brown v. Lee itself and would nullify the then-recent changes in the definition of "property" that the Brown v. Lee court was analyzing. To see why this is so, it is necessary to consider the 1957 amendments to Texas law and Brown v. Lee's interpretation of those changes.

Before 1957, the legal theory of title to insurance proceeds in Texas was somewhat unclear. In Warthan v. Haynes, 288 S.W.2d 481, 482-84 (Tex. 1956), the Texas Supreme Court held that a wife had no community property interest in the proceeds of a life insurance policy on the life of her husband, even when the policy was bought during marriage and paid for with community funds. This holding did not last long, however, because in 1957, the Texas legislature enlarged the definition of property to include "life insurance policies and the effects thereof." Tex. Rev. Civ. Stat. art. 23(1) (West 1969) (current version at Tex. Gov't Code Ann. §

10

312.011(13) (West 1988)).  The Texas Supreme Court in <u>Brown v. Lee</u> considered the 1957 amendments at length and noted that "the right to receive insurance proceeds payable at a future but uncertain date is 'property.'" 371 S.W.2d at 696.  It referred to such insurance proceeds as "a chose in action which matures at the death of the insured," and held that "[w]hen purchased with community funds, the ownership of the unmatured chose logically belongs to the community."  <u>Id.</u>

Immediately after examining the 1957 legislative changes, the <u>Brown v. Lee</u> court--in the paragraph quoted in full above--discussed the effect that settlement of an uninsured spouse's interest in a life insurance policy would have on her interest in the unmatured chose.  It is worth quoting the first sentence of the paragraph again for emphasis:

> Under circumstances where the uninsured spouse predeceases the insured spouse, settlement of the decedent's community interest in the unmatured chose [i.e., the proceeds rights] has ordinarily been resolved by allocating one-half of the cash surrender value to the deceased's estate and the other one-half, plus ownership of the unmatured chose, to the surviving spouse.

<u>Id.</u>  The Commissioner asserts that this sentence sets forth the rule that settlement of an uninsured spouse's interest in the proceeds of a life insurance policy occurs when one-half of the cash surrender value of the policy is included on the federal estate tax return of the uninsured spouse.

We are unable to discern where the Commissioner finds justification for her proposition.  Support is certainly not found in the text of the quoted sentence itself, for nowhere does it

11

mention that settlement under Texas law is accomplished by including one-half of the cash surrender value on a federal estate tax return. Furthermore, the Commissioner's proposed rule of law would abrogate the 1957 enlargement of the definition of property that the Texas legislature had promulgated shortly before Brown v. Lee was decided. The Brown v. Lee court recognized that the Texas legislature defined property to include the right to receive insurance proceeds payable at a later date. We do not think that the Texas Supreme Court intended to dispossess uninsured spouses (and their heirs) of their newly-acquired property right merely because they abided by federal law and included their share of the asset on their federal estate tax return.

The sentence at issue merely states that settlement is "resolved by allocating one-half of the cash surrender value to the deceased's estate." A more plausible reading of this clause is that settlement is effected when one-half of the cash surrender value is actually paid to the deceased wife's estate by the living husband; that is what "allocate" means in this context. And in this case, Bennett Cervin testified that he and his sister, after consultation with their father, decided not to seek allocation of their one-half value and to keep the insurance policies in effect.[4]

---

[4]At oral argument, the Commissioner's attorney asserted that settlement occurred when Manita Cervin's heirs could have received one-half of the cash surrender value of the policies. We do not think that Brown v. Lee supports this assertion. The IRS attorney also contended at oral argument that this is not a case in which Alto Cervin and his children had an agreement to maintain the children's fifty percent ownership interest in the policies. As evidence of this, he pointed to the fact that the parties amended the insurance policies such that decedent possessed sole rights to

12

Indeed, the second sentence of the much-quoted paragraph makes reference to the heirs of the deceased wife seeking compensation. This also suggests that the heirs of the deceased, uninsured spouse must be *compensated*. Because one-half of the cash surrender value was never distributed or allocated to the children of Alto and Manita Cervin, Manita Cervin's interest in the insurance policies remained unsettled, and thus the second rule of <u>Brown v. Lee</u> governs. Because Manita Cervin's community interest was never extinguished, under Texas law her children inherited that interest, which is one-half of the policy rights and one-half of the unmatured chose.[5] The Estate of Alto Cervin therefore contains only one-half interest in the policy rights and one-half interest in the proceeds rights, and it should be taxed on one-half of the value of the proceeds.

This reading of <u>Brown v. Lee</u> is fully consistent with the definition of "settlement" in Black's Law Dictionary: "'Settlement,' in reference to a decedent's estate, includes the full process of administration, distribution and closing." Black's Law Dictionary 1373 (6th ed. 1990). The cash surrender value of the policies was never distributed to Bennett Cervin and Nita-Carol

_____

many of the incidents of ownership. The fact that the children were never compensated for their one-half interest in the cash surrender value still justifies our belief that the children never settled their interest in the policies.

[5]The second sentence of the quoted paragraph also notes that the heirs must not be guilty of laches in attempting to seek compensation. The evidence shows that Manita Cervin's heirs had an agreement with their father not to be compensated for their one-half interest in the policies, and the Commissioner does not argue that they were guilty of laches.

13

Cervin Miskovitch, and thus Manita Cervin's estate was not settled.

Furthermore, the Commissioner's position also contradicts a unanimous body of legal authority, which she attempts to distinguish on the grounds that such authority involved situations where the estate was never settled. Take, for example, Estate of Cavenaugh v. Commissioner, 51 F.3d 597 (5th Cir. 1995). As in this case, the uninsured wife predeceased the insured husband--both of whom resided in Texas--and we held that only fifty percent of the proceeds of a term life insurance policy should be included in the estate of husband who survived his uninsured wife. Id. at 605.

It is true, as the Commissioner asserts, that in Cavenaugh we determined that the second rule of Brown v. Lee applies because the uninsured wife's estate was never settled or partitioned prior to the death of her husband. Id. at 602. The Commissioner argues that settlement never occurred because the wife's executor did not include any interest in the policies in question in the gross estate as reported on her federal estate tax returns. We think that the Commissioner misstates the facts of Cavenaugh. It appears that the wife's estate did list a value of her interest in the insurance policy at issue; that interest was listed as having a zero value, however, because the life insurance was term insurance. See id. at 603 n.9.

Moreover, even if we ignore the fact that the wife's ownership interest in the insurance was included in her gross estate in Cavenaugh, it is clear that the Cavenaugh Court did not interpret Brown v. Lee to mean that settlement of the uninsured's interest in

14

the proceeds occurs merely by including the value of the uninsured wife's one-half interest on her estate tax return. Instead we noted that under Brown v. Lee, "the community interest of the deceased uninsured wife in the proceeds was not extinguished sans partition or laches." Id. at 604 n.10 (emphasis omitted). The Commissioner provides no support for the proposition that the inclusion of an asset on a federal tax return effects a partition, and there is no evidence that the Cervin heirs were guilty of laches. The Cavenaugh Court also cited the case of Amason v. Franklin Life Ins. Co., 428 F.2d 1144 (5th Cir. 1970), for the proposition that "the death of [the uninsured wife] without a partition created a tenancy-in-common between Mr. Cavenaugh and her estate's designated heirs vis à vis the policy." Cavenaugh, 51 F.3d at 603. Once again, the inclusion of Manita Cervin's one-half interest in the cash surrender value does not negate the tenancy-in-common between Alto Cervin and the children that was created when Manita Cervin died intestate.[6]

---

[6]We note that the Commissioner litigated this identical issue in the Ninth Circuit, asserting that the only interest in insurance policies that passed under the uninsured wife's will "was the right to receive one-half of the cash surrender value of the policies." See Scott v. Commissioner, 374 F.2d 154, 159 (9th Cir. 1967). The Ninth Circuit rejected this argument based on California community property law. Id. at 159-60. Analyzing Scott, the Cavenaugh Court held that:

> Although the community property laws of California and Texas differ in many respects, neither the IRS nor the Tax Court has produced authority confirming a meaningful variation between California and Texas law on this issue [i.e., regarding ownership of life insurance policies]. Specifically, Scott's treatment of a marital community dissolved via death-- construction of a tenant in common relationship--accords with the solution to dissolution adopted by Amason in the context of divorce. This parallelism is not only logical, but appears

The Commissioner also runs afoul the Treasury Regulations,

which provide an example directly on point:

> For example, assume that the decedent purchased a policy of insurance on his life with funds held by him and his surviving wife as community property, designating their son as beneficiary but retaining the right to surrender the policy. Under the local law, the proceeds upon surrender would have inured to the marital community. Assuming that the policy is not surrendered and that the son receives the proceeds on the decedent's death, the wife's transfer of her one-half interest in the policy was not considered absolute before the decedent's death. Upon the wife's prior death, one-half of the value of the policy would have been included in her gross estate. Under these circumstances, the power of surrender possessed by the decedent as agent for his wife with respect to one-half of the policy is not, for purposes of this section, an "incident of ownership," and the decedent is, therefore, deemed to possess an incident of ownership in only one-half of the policy.

Treas. Reg. § 20-2042-1(c)(5). Again, the Commissioner attempts to

distinguish this example on the grounds that Texas law is such that

the inclusion of one-half of the value of the policy in the wife's

gross estate settles (and extinguishes) the wife's interest in the

proceeds. The Commissioner continues to press this interpretation

of Brown v. Lee even though the above example expressly

contemplates that one-half of the value would be included in the

uninsured wife's gross estate and still holds that the decedent

---

compelled by the synergy of Amason and Brown v. Lee. Cavenaugh, 51 F.3d at 603-04.

Despite the foregoing paragraph, the Commissioner continues to assert, with success in the Tax Court, that Cavenaugh's discussion of the similarity between Texas and California community property law refers only to the interest of heirs of an uninsured spouse in the proceeds of community life insurance where there was no settlement. Therefore, the Commissioner asserts that California and Texas community property law differ on the definition of settlement. We believe that Brown v. Lee does not establish a contrary definition of settlement, and thus the rule set forth in Scott is applicable here.

16

possesses only one-half the incidents of ownership.

Last, but not least, is the Commissioner's own Revenue Ruling. Rev. Rul. 75-100, 1975-1 C.B. 303. In that ruling, the Commissioner considered facts almost identical to those in this case. The Commissioner ruled that because the estate of the predeceased, uninsured wife was not settled, the estate of the husband included only one-half of the value of the proceeds because the wife's one-half interest passed to her children. The Commissioner again attempts to distinguish this ruling on the grounds that the uninsured wife's interest was not settled in that example. The Revenue Ruling, which applied Texas law, makes it clear, however, that settlement is an agreement that must occur between the husband and the heirs or legatees of the wife, and not between the wife's estate and the federal government: "in the instant case, there was no settlement of W's community interest in the life insurance policy (between H and her legatees) between the time of her death and that of H ten days later, nor were the legatees of W's estate guilty of laches in failing to seek such a settlement."

In conclusion, the Estate of Alto Cervin owns only one-half of the policy rights because ownership of Manita Cervin's one-half interest in the policy rights passed to Bennett Cervin and Nita-Carol Cervin Miskovitch under section 45 of the Texas Probate Code (West 1980). Section 2042(2) of the Internal Revenue Code therefore dictates that the Cervin estate need include only one-half of the value of the proceeds ($65,462.88) in the gross estate

17

because it possesses only one-half of the policy rights. 26 U.S.C. § 2042(2).[7]

## II. LITIGATION COSTS

The Cervin estate argues that the Tax Court erred by denying its request for litigation costs under section 7430 of the Internal Revenue Code. Section 7430 provides that a "prevailing party" in a tax proceeding may recover "reasonable litigation costs incurred in connection with such court proceeding." 26 U.S.C. § 7430(a)(2); accord Nalle v. Commissioner, 55 F.3d 189, 191 (5th Cir. 1995). As defined in the statute, a party prevails if it establishes: (1) that the "position of the United States" in the proceeding was not "substantially justified"; (2) that the party has "substantially prevailed" with respect to the amount in controversy or with respect to the most significant issue or set of issues presented; and (3) that the party has met the applicable net worth requirements. 26 U.S.C. § 7430(c)(4)(A); Nalle, 55 F.3d at 191.

Our decision above establishes that the estate has substantially prevailed with respect to the amount in controversy regarding the insurance proceeds, and the Commissioner concedes that the estate substantially prevailed with respect to the amount in controversy regarding the valuation of the four properties. The Commissioner also does not argue that the estate has not met the

_____

[7]Because Bennett and Nita-Carol have owned one-half of the policy rights since Manita Cervin's death in 1978, they are responsible for one-half of the post-1978 insurance premiums. We therefore conclude that the Cervin estate must also include the accounts receivable of $35,268.16 from the children as reimbursement for the premiums paid by the decedent on the children's behalf.

18

net worth requirements.  Thus, the only element at issue is whether the "position of the United States" with respect to the insurance proceeds and the property valuation was substantially justified.

The term "substantially justified" means "'justified to a degree that could satisfy a reasonable person' and having a 'reasonable basis both in law and fact.'"  Nalle, 55 F.3d at 191 (quoting Pierce v. Underwood, 487 U.S. 552, 565 (1988)).  In determining whether the Commissioner's position was substantially justified, it is necessary to ascertain whether the Commissioner acted unreasonably, that is, whether she "knew or should have known that her position was invalid at the onset of the litigation."  Nalle, 55 F.3d at 191 (citing Bouterie v. Commissioner, 36 F.3d 1361, 1373 (5th Cir. 1994)).

The estate maintains that the position of the Commissioner was not substantially justified with respect to both the insurance proceeds issue and the property valuation matter.  We agree.

*A.    The Life Insurance Proceeds*

As noted above, in arguing that one hundred percent of the proceeds of the life insurance policies is includible in the decedent's gross estate, the Commissioner runs afoul of a legal principle set forth in a Treasury Regulation, a Revenue Ruling, and a Ninth Circuit case--each of which contains facts exceedingly similar to the present case.  The Commissioner is not concerned with this inconsistency, for she contends that the Texas Supreme Court case of Brown v. Lee outlines a different rule of law in the State of Texas.  This suggested rule of law, however--that merely

19

reporting one's ownership interest in a life insurance policy on a *federal* estate tax return can settle one's ownership interest in the policy for purposes of *state* law--is nowhere to be found in that opinion and indeed is inconsistent with the definition of property set forth by the Texas legislature.

The unreasonableness of the Commissioner's position is underscored by her argument that the gross estate includes *both* the full one hundred percent of the life insurance proceeds *and* the receivables from Bennett and Nita-Carol representing reimbursement of insurance premiums paid by the decedent--undisputably double taxation. In addition, the Commissioner continued to press her position even after Cavenaugh established that an insured wife's interest in an insurance policy may not be settled even when her estate tax return lists such an asset. See 51 F.3d at 602, 603 n.9. We recognize that our cases require a finding of unreasonableness at the onset of litigation and that Cavenaugh was not decided until after the Tax Court's decision. See Nalle, 55 F.3d at 191; Bouterie, 36 F.3d at 1367. Nevertheless, the Commissioner's insistence in her position in the face of Cavenaugh is evidence of her single-minded pursuit of the tax on the insurance proceeds in spite of state and federal law.

This and other circuits have held that the Commissioner's position was not substantially justified when she had ignored state law that clearly supported the taxpayer's position. See Nalle, 55 F.3d at 191-92 (citing cases). While the Commissioner's position in the instant case may not be as egregiously wrong as it was in

the cases cited by Nalle, her legal argument is unreasonable. The fact that the Tax Court ruled for the Commissioner, while a factor in favor of her position, is not dispositive. See Pate v. United States, 982 F.2d 457, 459 (10th Cir. 1993); Huckaby v. United States Dep't of Treasury, 804 F.2d 297, 299 (5th Cir. 1986). The Commissioner is certainly free to argue that different laws of the fifty states can have different tax consequences in each state, just as she may litigate the same issue in different circuits in order to create a conflict. That does not, however, suggest that taking an unsupported legal position in such instance is substantially justified. Cf. Estate of Perry v. Commissioner, 931 F.2d 1044, 1046 (5th Cir. 1991). Where the Commissioner elects to litigate an untenable position of state law, she "does so at the risk of incurring the obligation to reimburse such taxpayers for attorneys' fees pursuant to the provisions of Section 7430." Id.

B.   *The Property Valuation*

As noted above, the Commissioner initially determined that the estate was not entitled to any discount on any of the four parcels of real estate. One month before trial, however, the Commissioner's expert prepared a report stating that the estate was entitled to a five percent discount on the two higher-valued properties. In addition, in the Stipulation of Facts filed on the trial date, the Commissioner accepted the estate's valuation of the two lesser-valued properties. After hearing expert testimony from both sides at trial, the Tax Court decided that a twenty percent discount on the two higher-valued properties was appropriate, and

21

this holding has not been appealed.

On appeal, the estate asserts that the Commissioner's position regarding the valuation of the property was not substantially justified because the Commissioner relied upon the discredited unity-of-ownership theory in disallowing the twenty-five percent discount. The Commissioner does not dispute the fact that this circuit rejected the unity-of-ownership theory in Estate of Bright v. United States, 658 F.2d 999, 1005-07 (5th Cir. 1981) (en banc). Instead, she argues that the unity-of-ownership theory was never the "position of the United States" as that term is defined in Section 7430(c)(7) of the Code.

Section 7430(c)(7) defines "position of the United States" as the position taken in a judicial proceeding and also as the position taken in an administrative proceeding as of the date of the Notice of Deficiency. 26 U.S.C. § 7430(c)(7). Although we must determine the Commissioner's position as of the date of the Notice of Deficiency (filed on August 13, 1992), Lennox v. Commissioner, 998 F.2d 244, 248 (5th Cir. 1993), establishes that the Commissioner's position on that date must be viewed in the context of what caused the IRS to issue the Notice of Deficiency.

The record shows that the IRS first disallowed the twenty-five percent discount in its Notice of Proposed Adjustment sent to the estate on July 3, 1991. Included with the Notice of Proposed Adjustment was the Revenue Agent's examination report, which stated that the discount should be disallowed for two reasons. First, the agent noted that the Cervin estate had "presented no evidence of

22

sales of undivided fractional real estate interests which would corroborate its theory that undivided interests sell on the market for an amount less than their proportionate value." Second, the agent asserted that the unity-of-ownership theory should apply. The Cervin estate unsuccessfully protested the Notice of Proposed Adjustment, and the IRS, on August 13, 1992, sent the estate a formal Notice of Deficiency. We thus conclude that issuance of the Notice of Deficiency was based in large part upon the discredited unity-of-ownership theory.

It is true that the Commissioner abandoned the unity-of-ownership theory at some point after issuing the Notice of Deficiency but before trial, arguing instead that the estate had simply not presented adequate evidence to justify the twenty-five percent discount. Relying on Minahan v. Commissioner, 88 T.C. 492, 501 (1987), the estate maintains that the Commissioner may not "extricate himself from a holding of unreasonableness merely because his valuation expert is also unreasonable." In Minahan, the Commissioner first espoused the unity-of-ownership theory in support of the Notice of Deficiency, then on the date of the trial conceded that there was no deficiency. In arguing that litigation costs were not appropriate, the Commissioner in Minahan maintained that his position was not unreasonable because valuation is a factual question and reliance upon expert opinion is reasonable. The Tax Court rejected this argument, noting that not only was the unity-of-ownership theory untenable, but also that the Commissioner's valuation expert was unreasonable, as evidenced by

23

the fact that the Commissioner simply capitulated before trial. See id. at 500.

In the present case, the Commissioner did not totally capitulate at trial and instead presented expert testimony on the valuation issue. Nevertheless, we are guided by Minahan. Until at least the date of the Notice of Deficiency, the Commissioner relied upon a discredited legal theory and maintained that the estate was entitled to no discount on any of the four parcels of real estate. Not until after the issuance of the Notice of Deficiency did the Commissioner abandon her reliance on the unity-of-ownership theory. Moreover, shortly before trial the Commissioner agreed that the estate was entitled to a slight (five percent) discount on two of the properties, and at trial the Commissioner capitulated as to the other two properties. Finally, the Tax Court found the estate's expert to be more persuasive, determining that a twenty percent discount was appropriate on the two contested properties. In short, the above shows that the Commissioner's stance on the property valuation was unreasonable.

## CONCLUSION

The Cervin estate need include one-half the value of the life insurance proceeds and the accounts receivable from the children. The position of the Commissioner was not substantially justified, and thus the estate is entitled to reasonable litigation costs.

For the foregoing reasons, we REVERSE and REMAND.